**CENTRAL HANOVER BANK & TRUST CO. et al. v. HOEY.**

**DILLON et al. v. HOEY.**

Civil Actions Nos. 3—191, 3—192.

District Court, S. D. New York.

Oct. 24, 1947.

Shearman & Sterling & Wright, by Charles C. Parlin and Margaret Smith, all of New York City, for plaintiffs.

John F. X. McGohey, by Laurence H. Axman, both of New York City, for defendant.

BONDY, District Judge.

These two actions involving the same issues of fact and law were consolidated for the purpose of trial. They originally were tried in November, 1945. In September, 1946, the judge who tried them disqualified himself. Upon the transcript of the minutes of the trial, upon the depositions and memoranda submitted to him and upon files of the Central Hanover Bank

and Trust Company received in evidence pursuant to stipulation, and the additional evidence taken before me on April 24, 1947, upon the reopening of the case for trial, the court hereby makes the following Findings of Fact and Conclusions of Law:

## Findings of Fact

1. Action No. 3—191 was brought by Central Hanover Bank and Trust Company and Clarence Dillon, trustees under a trust indenture dated December 31, 1931.

2. Action No. 3—192 was brought by Clarence Dillon and Anne D. Dillon, his wife.

3. The defendant in each case is Jane M. Hoey, as executrix of the estate of James J. Hoey, deceased. James J. Hoey was Collector of Internal Revenue for the Second District of New York in 1934 and was originally the defendant in these actions. After the actions were instituted he died and the defendant Jane M. Hoey as executrix of his estate was substituted as defendant.

4. Plaintiffs in Action No. 3—191 on or before March 15, 1935, filed a Federal Income Tax Return for the year 1934 showing net income of $59,194.27 subject to tax and a tax of $10,220.81 due thereon which they paid to the Collector of Internal Revenue.

5. On February 15, 1937, these plaintiffs filed with the Collector a claim for a refund of said tax but no part thereof has been refunded.

6. Clarence Dillon and Anne D. Dillon, plaintiffs in Action No. 3—192, filed a joint Federal Income Tax Return for the year 1934. After audit and review of said return, the Commissioner of Internal Revenue on the June and July 1938 assessment rolls assessed additional income taxes against them of $18,235.13, and $3,687.30 interest, making total assessments of $21,922.43.

7. On July 22, 1938, after demand by the Collector of Internal Revenue the said individual plaintiffs paid to the Collector the said alleged deficiency, together with the interest thereon.

8. On September 29, 1938, said plaintiffs filed with the Collector a claim for a refund of $17,888.50 of the additional taxes so paid for the year 1934 and $3,613.55 interest thereon amounting to $21,502.05, no part whereof has been refunded.

9. On December 31, 1931, Clarence Douglas Dillon, hereinafter referred to as Douglas Dillon, son of Anne D. and Clarence Dillon, executed a trust indenture in which Douglas Dillon was named as grantor and Central Hanover Bank and Trust Company, Clarence Dillon and Douglas Dillon were named as trustees. Pursuant to the indenture Douglas Dillon transferred to the trustees certain securities (said trust being herein referred to as the "security trust"). The "security trust" provides that the trustees thereunder should pay to the trustees of another trust created at the same time and herein referred to as the "insurance trust," so much of the net income of the "security trust" as the trustees of the "insurance trust" certified to be required to pay the premiums on insurance policies on the life of Clarence Dillon held by them and it authorizes the trustees of the "security trust" to encroach upon principal for such purpose. It is provided that the remainder of the income of said "security trust" is to be paid to Clarence Dillon for life. After the death of Clarence Dillon the entire income of the trust is payable to Douglas Dillon for life. After the death of the survivor of Clarence and Douglas Dillon, one-quarter of the income is to be paid to Douglas Dillon's widow for life and three-quarters to his issue or if no issue to his mother, Anne D. Dillon, if living, and if not living to his sister Dorothy. On the termination of the trust the principal is to be distributed to the issue of Douglas Dillon or if none, then to his mother, or if not living, then to his sister or his sister's issue, or if none then living, then to his widow or two sisters of Clarence Dillon, or if neither is then living, then to Harvard College. The trustees of the "security trust" are empowered to encroach upon the whole amount thereof for the benefit of Clarence Dillon whenever in their opinion such encroachment is for his best interest and protection or welfare.

10. In the "insurance trust" indenture also executed December 31, 1931, Douglas

Dillon is named as grantor, and Central Hanover Bank and Trust Company and Douglas Dillon as trustees. Douglas Dillon transferred to the said trustees thirty-nine insurance policies on the life of Clarence Dillon of the total face amount of approximately $1,500,000 and a cash surrender value of about $180,000. The "insurance trust" provides that the trustees should certify to the trustees of the "security trust" the amount required to pay the premiums on the insurance policies held by them. Upon Clarence Dillon's death the trustees are to collect the net proceeds of the policies and to pay the income thereon to Anne D. Dillon, the widow of Clarence Dillon, for life. After the death of the survivor of Anne D. and Clarence Dillon the trustees are to divide the principal into two equal parts, the income of one of which is payable to Douglas Dillon for life and the income of the other to his sister Dorothy for life. The issue of Douglas is to receive the principal of his share and the issue of Dorothy the principal of her share. In default of such issue the entire principal is payable to two sisters of Clarence Dillon.

11. Douglas Dillon was born August 21, 1909. He married March 10, 1931. In June, 1931, he was graduated from Harvard College. Subsequently he was employed by the banking firm of Dillon, Read & Company, of which Clarence Dillon was the senior partner.

12. For the year 1934 the net income of the "security trust" available for distribution was $117,253.75 of which $59,194.27 was distributed to the trustees of the "insurance trust" upon certification of such amount by them in the manner specified in the Trust Indenture and the remaining $58,059.48 was distributed to Clarence Dillon. The sum of $59,194.27 so distributed to the trustees of the "insurance trust" was applied by them to the payment of current premiums on the policies on the life of Clarence Dillon held in the "insurance trust" and this sum was reported as taxable income in the Federal Income Tax Return filed by them for the year 1934. The sum of $58,059.48 distributed to Clarence Dillon was reported as taxable income in the joint Federal Income Tax Return filed by him and his wife for the year 1934.

13. $17,888.50 of the $18,235.13 deficiency assessed against said individual plaintiffs for the year 1934, was assessed solely on the ground that Clarence Dillon actually was the creator of the "security trust" and that the income therefrom to the extent of the sum of $59,194.27, paid to the trustees of the "insurance trust" in that year by the trustees of the "security trust" and used by them to pay premiums on insurance on the life of Clarence Dillon, was taxable to said Clarence Dillon. Said sum was the same as that on which the trustees had paid the tax of $10,220.81.

14. The life insurance policies which Douglas Dillon transferred to the "insurance trust" had been transferred to him by his father, Clarence Dillon, a short time before the creation of the "insurance trust". His father had stated to Douglas Dillon his intention of doing so, some time in the early part of December, 1931. Thereafter Douglas Dillon consulted counsel and it was with their advice that the "insurance trust" and the "security trust" were established.

15. The securities transferred by Douglas Dillon to the "security trust" on December 31, 1931 consisted solely of a large part of the principal of three trust funds advanced to him March 9, 1931 under encroachment provisions the day before his marriage.

16. These three trust funds had been established April 14, 1923, December 31, 1926, and February 24, 1928, respectively. None of the Trust Indentures contained any reservation of power to revoke or modify. Under the 1923 trust, of which Anne D. Dillon, Clarence Dillon and his sisters Bertha Dillon, Evelyn Hague and Jeanie Joel Dillon were named as grantors, and under the 1926 trust, of which Clarence Dillon was named as grantor, a fund was placed in trust, the income of which was to be paid to Douglas Dillon until he attained the age of thirty-five years, when the remainder thereof was to be paid to him. He had the power to appoint such persons as he might designate in his will to receive the remainder if he should not at-

tain that age. Under the 1928 trust, of which Clarence Dillon was named as grantor, the income was to be paid to Douglas Dillon so long as he lived, and the entire remainder was to be paid to such persons as he might designate in his will. In the absence of appointment, the remainder of the 1923 trust was to be paid to his issue, or if none to his sister or to her issue, or if none to Clarence Dillon and, if not living, to members of his family, and the remainder of the 1926 and 1928 trusts were to be paid to his issue, or, if none, income was to be paid to his sister and upon her death, or if she predeceased him, the remainder to her issue, or if none, to Clarence Dillon, or if not living, to members of his family.

17. Upon resignation of the trustees of the said three trusts, other than Clarence Dillon and his wife, Anne D. Dillon, the Central Hanover Bank and Trust Company on June 9, 1930, became a trustee of each trust. Douglas Dillon became a trustee of each trust March 9, 1931.

18. Paragraph "Eighth" of the 1923 trust provided that all the individual trustees with the consent of the persons then entitled to receive more than fifty per cent. of the trust income might remove a corporate trustee. Paragraph "Fifth" of the 1926 and 1928 trusts provided that all the individual trustees with the consent of the then income beneficiary might remove a corporate trustee.

19. On March 9, 1931, the trustees of the April 14, 1923 trust were Clarence Dillon, Anne D. Dillon, Douglas Dillon and Central Hanover Bank and Trust Company. In granting the application of Douglas Dillon for encroachment upon the principal the trustees acted pursuant to Article "Ninth" of the Trust Indenture which provided in part as follows:

"Ninth: The Trustees are authorized at any time and from time to time to make advances from any trust fund held under this Indenture to a beneficiary entitled at the time being to the income thereof, even to the whole amount of the principal of such fund, such advances to be charged against the principal of said fund from which the income of said beneficiary is then derived, whenever in the opinion of all the Trustees at the time being such advances are for the best interest, protection and welfare of such beneficiary and his or her dependents * * *. The word 'Trustees' as used throughout this paragraph 'Ninth' shall be taken to mean the persons and/or corporation at any time acting as Trustees, except Clarence Dillon and Anne Douglas Dillon and any other party of the first part who may become a Trustee, it being the intention of the parties to this Indenture that the power to make advances conferred by this paragraph 'Ninth' shall be conferred upon and may be exercised by the Trustees who are not parties of the first part, with the same force and effect as if such Trustees were the sole Trustees of the trusts created by this Indenture."

20. On March 9, 1931, the trustees under the December 31, 1926 trust were Clarence Dillon, Anne D. Dillon, Douglas Dillon and Central Hanover Bank and Trust Company. In granting the application by Douglas Dillon for encroachment upon the principal the trustees acted pursuant to Article Sixth of the Trust Indenture which provided in part as follows:

"Sixth: The Trustees are authorized at any time and from time to time to make advances from the trust fund held under this Indenture to the beneficiary entitled at the time being to the income thereof, even to the the whole amount of the principal of such fund, such advances to be charged against the principal of said fund, whenever in the opinion of all the Trustees at the time being such advances are for the best interest, protection and welfare of such beneficiary and his or her dependents, * * *. The word 'Trustee' as used throughout this paragraph 'Sixth' shall be taken to mean the persons and/or corporation at any time acting as Trustees, except Clarence Dillon."

21. On March 9, 1931, the trustees under the February 24, 1928 trust were Clarence Dillon, Anne D. Dillon, Douglas Dillon and Central Hanover Bank and Trust Company. In granting the application by Douglas Dillon for encroachment upon the principal, the trustees acted pur-

suant to Article Sixth of the Trust Indenture which provided in part as follows:

"Sixth: The Trustees are authorized at any time and from time to time to make advances from the trust fund held under this Indenture to the beneficiary entitled at the time being to the income thereof, even to the whole amount of the principal of the trust fund, such advances to be charged against the principal of the trust fund, whenever in the opinion of all the Trustees at the time being such advances are for the best interest, protection and welfare of such beneficiary, and his or her dependents, * * *. The word 'Trustees' as used throughout this paragraph 'Sixth' shall be taken to mean the persons and/or corporation at any time acting as Trustees, except Clarence Dillon."

22. As reported for federal income tax Douglas Dillon's net income was in excess of $139,000 in 1931 and in excess of $166,000 in 1932. For the year 1931 his father, Clarence Dillon, had a "negative income."

23. At the time of the establishment of the "insurance trust" and the "security trust" Douglas Dillon consulted counsel and his father, Clarence Dillon.

24. The transfer of the property from the trustees of the three trusts hereinabove mentioned was made by the trustees unconditionally and without any restrictions or limitation and vested absolute title to the principals of the trusts in Douglas Dillon.

25. At the time of the establishment of the "security trust" and the "insurance trust", both funds were the property of Douglas Dillon.

## Conclusions of Law.

1. Douglas and not Clarence Dillon was the grantor of the "security trust."

2. The income of the "security trust" for the year 1934 in the sum of $59,194.27 was not income of Clarence Dillon under Section 22(a) or under Section 167(a) (3) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Code, §§ 22(a), 167(a) (3).

3. The defendant is entitled to judgment against the plaintiffs dismissing the complaint in Action No. 3—191 and the plaintiffs are entitled to judgment against the defendant in Action No. 3—192 for the sum of $17,888.50 together with interest.

## Opinion.

The tax upon $59,194.27 of the income of the "security trust" having been paid by both the trustees and by the individual plaintiffs, the question as to the right to a refund of the tax erroneously paid depends upon whether Clarence Dillon or his son Douglas Dillon was the grantor of the "security trust" which yielded the $59,194.27 used to pay premiums on insurance policies on the life of Clarence Dillon.

Section 167(a) (3) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev. Code, § 167(a) (3), in so far as applicable, provides that where any part of the income of a trust is applied to the payment of premiums upon policies of insurance on the life of the grantor, such part of the income of the trust shall be included in computing the net income of the grantor.

The grantors of the 1923, 1926 and 1928 trusts transferred irrevocably all their right, title and interest in the corpus of each of the trusts to the trustees. The record does not disclose any facts which would justify the inference that, when these trusts were established, any grantor intended to recapture, or again become the owner in his own right of any of the securities transferred.

The exercise of the power of encroachment upon the principal of each trust depended upon the will of the son and the determination of trustees other than the father that encroachments would be for the best interest, protection and welfare of the son and his dependents. The provisions of the indentures do not justify the inference that the power was given to enable the father to recapture any of the securities. He alone could not authorize or prevent encroachment.

There is testimony that at the time of the encroachments the son was twenty-one years old, a student at Harvard, about to be married, and entitled to the income of an approximately $4,000,000 trust in addition to the income of the three trusts encroached upon, the principal of which also amounted in the aggregate to about $4,000,-

000. He testified that he stated to a vice-president of the Central Hanover Bank and Trust Company that he desired the encroachments to be made to enable him to provide for the payment of income to his future wife during her life and for the payment of the remainder to their children, if any, which he was advised by counsel he could not adequately do under the power of appointment by will given to him by the indentures. The necessary documents for the encroachments were drawn by the Trust Company at the original request of a representative of the Dillon family and not by Douglas Dillon, advising the company that the son desired the encroachments to be made. These documents were drawn before the Trust Company consulted Douglas Dillon. They were in preparation Friday, March 6th, executed in Boston by Douglas Saturday, March 7th or Sunday, March 8th and the securities were delivered to Dillon, Read & Co. Monday, March 9th. Douglas Dillon also testified that he took the word of the Trust Company that the amount turned over to him was correct, without making any investigation. However, it does not appear by any direct evidence that the Trust Company had any notice or any reason to believe that the father or mother had any intention to recapture the securities through the encroachments. It may not be assumed, at least in the absence of proof, that a trust company has committed a breach of trust by becoming a party to a plan to deprive a beneficiary of the benefits of a trust in order to enable a grantor to recapture the corpus thereof after his absolute and unqualified disposition thereof. See Central Nat. Bank v. Com'r of Internal Revenue, 6 Cir., 141 F.2d 352, 355, 356, 153 A.L.R. 542; Helvering v. McCormack, 2 Cir., 135 F.2d 294, 297; Hall v. Commissioner of Internal Revenue, 10 Cir., 150 F.2d 304, 308.

Douglas Dillon also testified by deposition that the encroachments were made to give him some free money to use at the time of his marriage. However, subsequently as heretofore stated, he testified in open court that he invaded the three trusts because he was advised by counsel that he could not make the provision which he desired for his wife and children by exercising the power of appointment contained in the trust agreements. Under the "security trust" his wife and issue are deprived of all income during his father's lifetime and of the entire principal and income should the trustees encroach thereon for his father's benefit, even if the premiums of the policies could not then be paid out of the "security trust". He created an "insurance trust", consisting of policies transferred to him, the income of which is payable after his father's death to his mother who enjoyed a regular and substantial income, and upon her death to him and his sister without any benefit to his wife. It is possible that this disposition was planned by the father to redistribute the principal of the three trusts. There is no evidence in the case that the father who had created additional trusts of millions of dollars for the benefit of Douglas Dillon and other members of the family was financially unable to pay the premiums, and the testimony of the son that he created the "security trust" in the manner in which he did because his father's income for the taxable year was negative is not very convincing.

However, even if it were permissible to infer from all the circumstances that the three original trusts were encroached upon improperly at the request of the father and with undue haste on the part of the trust company in exercising its discretion in favor of the encroachments, the principal of the trusts upon the encroachments became the property of the son. The property was recognized by the father as that of the son to whom the income was paid up to the time of the creation of the "insurance" and "security" trusts. It is not reasonable to believe that the son would give or the father accept the absolute control of the securities with power to do with them as he pleased because the doing so would clearly render the father taxable for the entire income thereof including the amount of the premiums paid on the policies, and would thwart the purposes ascribed to the father. It is more reasonable to believe that the father would have refused the gift and would have suggested to the son that the son should create the trust for the payment of premiums and thereby save the father

the liability therefor. The policies were not on the life of the son who created the "security trust" nor were the premiums paid by the father with money which the father controlled through the establishment of any short term trusts, or through any reservation of any interest in a trust created by him or through any power of revocation or modification thereof. It may be that the "security" and "insurance" trusts were established by the son for the purpose of enabling the father to avoid taxation on the money used for the payment of the premiums. It however remains a fact that they are payable out of property which belonged to the son and all and any part of which he could have given to his father. He and not the father was the grantor of the "security trust". The income thereof was not made payable for premiums upon insurance policies upon the life of the grantor.

Accordingly there should be judgment in favor of the individual plaintiffs in the action brought by them and judgment dismissing the complaint in the action brought by the trustees.